FILED

07 JUN 22 AM 8:56

CLERK. U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

PDC

BY:                                    DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

MYTEE PRODUCTS, INC., a
California corporation,

                                    Plaintiff,

        vs.

H.D. PRODUCTS, INC., d.b.a. HIGH
DESERT PRODUCTS, a corporation;
MC VIKING EQUIPMENT CO., INC.
d.b.a. VIKING AIR MOVERS, a
corporation; MARK S. WALKER,
JR.; CHARLES PARDUS,

                                    Defendant.

CASE NO. 05CV2286 R (CAB)

ORDER GRANTING IN PART
AND DENYING IN PART
MYTEE'S MOTION FOR
PARTIAL SUMMARY
JUDGMENT

## I.    Introduction

    This is an action for violation of the Lanham Act, breach of contract, violation
of California law prohibiting unfair competition, and misappropriation of trade secrets.
Plaintiff Mytee Products, Inc. ("Mytee") seeks summary judgment on some of its
claims as well as some of the defenses asserted in the Answer to the Second Amended
Complaint.  For the reasons set forth below, the motion is granted in part and denied
in part.

/ / /

/ / /

/ / /

05CV2286

## II.   Background

Plaintiff Mytee is a company that manufacturers industrial cleaning machines and "extractors," which are vacuums that use liquid, heat and chemicals to clean floors. Since 1988, Mytee has also manufactured "air mover" fans that are portable fans used to dry out wet areas, such as rooms that have flooded. Air movers use either an axial fan or a cylinder-shaped fan. Air movers with a cylinder-shaped fan are called "squirrel cage" or "squirrel type" air movers.

Mytee has sued Mark Walker, Charles Pardus, H.D. Products, Inc. ("H.D. Products"), and MC Viking Equipment Co., Inc. ("Viking" or "Viking Equipment"), collectively referred to as "defendants." Walker is the President of H.D. Products. Walker and Pardus are owners and officers of Viking Equipment, which was formed on or about May 12, 2004.

In April of 2004, Mytee was manufacturing three squirrel-cage air movers which were known as the Windstar, Windstorm, and Mytee-Dry. On April 30, 2004, H.D. Products and Mytee entered into a written Equipment Purchase Agreement whereby Mytee agreed to sell and H.D. Products agreed to purchase "(1) eleven squirrel-type air-mover molds, (2) the trade marks "Windstar" and "Windstorm," (3) a customer list for air-mover vendors and clients with pricing information, (4) three computers, (5) three workstations, (6) three bench tables, (7) 120 lineal feet of racks, and (8) $70,000 in parts inventory related to said molds." Exhibit 1 to Exhibit 2, Pardus Depo. The agreement was signed by John LaBarbera, as President of Mytee, and Mark Walker, as President of H.D. Products.

This action arises out of defendants' use of the Mytee trademark on Windstar and Windstorm air movers as well as in user manuals accompanying the air movers. Defendants contend that John LaBarbera, Mytee's President, authorized such use. Mytee disputes such authorization was given.

05CV2286

III.   **Analysis**

    A.    **Summary Judgment as to Mytee's Lanham Act claims**

As Mytee recognizes in its moving papers, "[t]o succeed on a claim for trademark infringement or unfair competition, the moving party must establish:

> (1) ownership of the trademark at issue;
>
> (2) use by defendant, without authorization, of a copy, reproduction, counterfeit or colorable imitation of the moving party's mark in connection with the sale, distribution or advertising of goods or services; and
>
> (3) that defendant's use of the mark is likely to cause confusion, or to cause mistake or to deceive.

Toho Co., Ltd. v. William Morrow and Co., Inc., 33 F.Supp.2d 1206, 1210 (C.D.Cal. 1998); see also 15 U.S.C. § 1114(a) (providing for civil liability for use in commerce of a reproduction of a registered mark "without the consent of the registrant"); Bosley Medical Institute, Inc. v. Kremer, 403 F.3d 672, 676 (9th Cir. 2005) ("The Supreme Court has made it clear that trademark infringement law prevents only *unauthorized* uses of a trademark in connection with a commercial transaction in which the trademark is being used to confuse potential consumers.") (dicta) (emphasis added); E & J Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1288 n. 2 (9th Cir. 1992) (recognizing that "the elements of infringement and unfair competitions claims are essentially the same; the rulings stand or fall together").

With respect to the element of lack of authorization, Mytee presents the declaration of John LaBarbera, the President of Mytee, who states that he never authorized or consented to defendants' use of the Mytee trademark. However, defendants have presented a significant amount of evidence that creates a genuine issue of material fact as to whether Mytee, through LaBarbera, gave its consent for defendants to use the Mytee trademark on the Windstar and Windstorm airmovers.

First, there is evidence from which a factfinder could find that John LaBarbera

1  told defendants Walker and Pardus that "they" could use the Mytee name on the air
2  movers they were going to be selling, and the understanding was that "they" referred
3  to Walker, Pardus, and their business MC Viking Equipment Company, Inc.  See
4  Exhibit 1, Walker Depo. at 19:25-28:18; 47:15-25; 73:17-79:10; Exhibit 2, Pardus
5  Depo. at 63:5-22; 107:3-15; Exhibit 3, Shoemaker Depo. at 60:1-12; Exhibit 4,
6  Robertson Depo.[1] at 5:4-7:22; Walker Decl. ¶ 5.

7       Second, Walker and Diane Robertson, a former Mytee employee, testified that
8  LaBarbera authorized Mytee employees to load labels containing Mytee's trademark
9  onto trucks to ship to defendants.  See Exhibit 1, Walker Depo. at 38:9-40:24; Exhibit
10  4, Robertson Depo. at 7:13-25.  Moreover, Walker testified that defendants received
11  over a thousand Mytee labels from Mytee.  See Exhibit 1, Walker Depo. at 38:9-41:24.

12       Third, John Shoemaker (also known as John Perez), a Mytee employee in June
13  2004, electronically sent a letter dated June 7, 2004 to Mytee's distributors informing
14  them that Mytee had sold its airmover business to "Viking Equipment" and that
15  "Viking Equipment" would "continue to produce airmovers under the Mytee Windstar
16  and Windstorm Label." Exhibit 4 to Exhibit 3, Shoemaker Depo.; see also Exhibit 3,
17  Shoemaker Depo. at 71:19-72:17.  The letter explained: "This will help in making a
18  seamless transition for you and your customers." Exhibit 4 to Exhibit 3, Shoemaker
19  Depo. John Shoemaker testified at his deposition that this letter was sent to Mytee's
20  distributors after John LaBarbera reviewed the letter and gave permission for it to be
21  sent.  Exhibit 3, Shoemaker Depo. at 73:10-20.   A factfinder could construe the
22  language of this letter as a representation by Mytee that defendants had the right to use
23  the Mytee  trademark on the Windstar and Windstorm airmovers they were selling.

24       Fourth, there is evidence that at a Mytee sales rep meeting in September 2004,
25  John LaBarbera was present when Walker and Pardus showed everyone their
26  brochures, which had the Mytee trademark on them, and John LaBarbera told the reps

27
28  [1] With respect to this exhibit, some of the original deposition page numbers are not visible.  Thus, for this exhibit, where the original deposition page number is not visible, the court will use the handwritten page numbers at the bottom of this exhibit.

1   that Mytee was letting them use the Mytee trademark to help them out.  Exhibit 3,
2   Shoemaker Depo. at 63:5-19.

3       Simply put, with one exception, there are genuine issues of material fact as to
4   whether defendants were authorized by Mytee to use the Mytee trademark in
5   conjunction with their sale of the Windstar and Windstorm air movers.  The exception
6   is that it is undisputed that Viking Equipment did not have authorization to use the
7   Mytee trademark after April 30, 2005.  See Exhibit D, Viking Equipment's Response
8   to Request for Admission No. 9; see also Fed.R.Civ.P. 56(d) ("If on motion under this
9   rule judgment is not rendered upon the whole case or for all the relief asked and a trial
10  is necessary, the court . . . shall if practicable ascertain what material facts exist without
11  substantial controversy  . . . .").

12      In its reply, Mytee relies on 15 U.S.C. § 1115(b) in an attempt to prove that
13  defendants' use was unauthorized.  Section 1115(b) provides that once a trademark
14  becomes incontestable pursuant to 15 U.S.C. § 1065, the registration of the trademark
15  becomes "conclusive" evidence of the registrant's "exclusive" right to use the
16  registered trademark.  However, a registrant with an incontestable trademark can
17  always grant a license to others to use the trademark.  Thus, § 1115(b) cannot properly
18  be applied to establish, as a matter of law, that another's use was unauthorized.  If such
19  were the case, then a licensee could never rely on a license agreement granting the
20  licensee permission to use a registered mark.  Moreover, even if § 1115(b) operates to
21  shift the burden to defendants to produce evidence that their use was authorized, as
22  demonstrated *supra*, defendants have met that burden.

23      Finally, although not raised by the parties, it should be noted that there appears
24  to be factual issues regarding the ownership of the Mytee trademark that would
25  preclude summary judgment.  Although this action is brought by the corporation Mytee
26  Products, Inc., the owner of the Mytee trademark is John LaBarbera, "DBA Mytee
27  Products."  See Exhibit A.  As explained in Pinkerton's, Inc. v. Superior Court, 49
28  Cal.App.4th 1342 (1996):

1
2
3
4
5
6
7
8

> The designation of "DBA" or "doing business as" simply indicates Pinkerton's, Inc., operates under a fictitious business name. (See Bus. & Prof.Code, § 17900 et seq. [regulating fictitious business names].) *Use of a fictitious business name does not create a separate legal entity.* As the First District Court of Appeal recently noted, " '[t]he designation [DBA] means "doing business as" but is merely descriptive of the person or corporation who does business under some other name. *Doing business under another name does not create an entity distinct from the person operating the business.*' [Citation.] The business name is a fiction, and so too is any implication that the business is a legal entity separate from its owner." (Providence Washington Ins. Co. v. Valley Forge Ins. Co. (1996) 42 Cal.App.4th 1194, 1200, 50 Cal.Rptr.2d 192, italics added, quoting Duval v. Midwest Auto City, Inc. (D.Neb.1977) 425 F.Supp. 1381, 1387, affd. (8th Cir.1978) 578 F.2d 721.)

9
10
11
12
13
14
15
16

Id. at 1348 (emphasis added).  Because "[d]oing business under another name does not create an entity distinct from the person operating the business," id., the owner of the Mytee trademark as set forth in the registration certificate is John LaBarbera, not "Mytee Products," which is only a fictitious business name.  Moreover, Mytee has failed to present any evidence suggesting that LaBarbera ever transferred or assigned the Mytee trademark to plaintiff Mytee Products, Inc.  As explained in Watts v. United States, 703 F.2d 346 (9th Cir. 1983):

17
18
19
20

> A plaintiff who seeks summary judgment and who fails to produce sufficient evidence on one or more essential elements of the claim is "no more entitled to a judgment ... than is a plaintiff who has fully tried the case and who has neglected to offer evidence sufficient to support a finding on a material issue upon which [the plaintiff] bears the burden of proof." [United States v. Dibble, 429 F.2d 598, 601 (1970).] In either situation, there is a failure of proof.

21
22

Id. at 347.  Accordingly, this would appear to be a second, alternate basis for denying plaintiff Mytee Products, Inc.'s motion for summary judgment.

23
24

**B.    Summary Judgment as to defendants' defenses related to Mytee's Lanham Act Claims**

25
26
27
28

Mytee also seeks summary judgment on various defenses asserted by defendants. Mytee contends that "defendants bear the burden of proof on all of their affirmative defenses." Memo. of Points and Authorities in Support of Mytee's Motion for Partial Summary Judgment at 11:10-11. Although it is true that, with respect to their defenses,

05CV2286

1   defendants have the burden of proof *at trial*, Mytee, as the summary judgment movant,
2   bears both the initial burden of production and the ultimate burden of persuasion.
3   Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th
4   Cir. 2000).   To meet its burden of production, it "must either produce evidence
5   negating an essential element of" defendants' defense or demonstrate that defendants
6   do "not have enough evidence of an essential element to carry [their] ultimate burden
7   of persuasion at trial." Id. To carry its ultimate burden of persuasion on the motion,
8   Mytee must demonstrate that there are no genuine issues of material fact. Id.

9       If Mytee "fails to carry its initial burden of production," defendants have "no
10   obligation to produce anything," even though they would have the ultimate burden of
11   persuasion with respect to their defenses at trial. Id. at 1102-03. However, if Mytee
12   as the moving party "carries its burden of production," defendants, as the nonmovants,
13   "must produce evidence to support [their] . . . defense." Id. If defendants then "fail[]
14   to produce enough evidence to create a genuine issue of material fact," Mytee is
15   entitled to summary judgment. Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322,
16   106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).   But if defendants, as the nonmovants,
17   produce "enough evidence to create a genuine issue of material fact," then defendants
18   defeat the motion. Id.

19       *Oral License (First Defense)*

20       First, Mytee seeks summary judgment as to defendants' defense that they had an
21   oral license to use the Mytee trademark on the Windstar and Windstorm air movers.
22   See Answer to Second Amended Complaint ¶ 26.  Although defendants' answer does
23   not allege that this oral contract was for a limited time period, defendant Viking, in its
24   response to interrogatories, admitted that it did not have permission to use the Mytee
25   trademark after April 30, 2005. See Exhibit D, Response to Request Nos. 9 and 10.
26   Thus, on these facts, Viking cannot prevail as a matter of law on the defense that it had
27   an oral agreement to use the Mytee trademark after May 1, 2004. However, Mytee has
28   failed to demonstrate that it is entitled to summary judgment with respect to this

1  defense in any other respect.

2       Mytee contends that, as a matter of law, the defense that defendants had an oral

3  license fails because, in light of defendants' admission that they did not pay for the oral

4  license, the alleged promise to grant the license was unsupported by consideration.

5  In California, consideration "may be either (1) a benefit conferred or agreed to be

6  conferred upon the promisor or some other person; or (2) a detriment suffered or agreed

7  to be suffered by the promisee or some other person."   1 Witkin, Summary of

8  California Law, Contracts § 203.  Although there is no evidence that defendants, as

9  promisees, suffered a detriment from Mytee's alleged promise to allow defendants to

10  use the Mytee trademark, there is evidence from which a reasonable factfinder could

11  find that defendants' use of the Mytee trademark conferred a benefit on Mytee.

12  Specifically, a reasonable factfinder could find that Mytee benefitted from defendants'

13  use the Mytee trademark on the Windstar and Windstorm air movers because it resulted

14  in a "seamless transition" for Mytee's distributors and its customers.  Exhibit 4 to

15  Exhibit 3, Shoemaker Depo. (letter from Mytee to its distributors stating that defendant

16  Viking would "continue to produce airmovers under the Mytee Windstar and

17  Windstorm Label" and that this would "help in making a seamless transition for you

18  and your customers"); see also Walker Depo. at 21:5-8 (testifying that LaBarbera said

19  that defendants' use of the Mytee trademark would be good for his business because

20  it would result in a smooth transition); Exhibit 2, Pardus Depo. at 63:9-18 (testifying

21  that LaBarbera allowed them to use the Mytee name, saying that  Mytee had orders in-

22  house that needed to be processed, and it would make a nice transition); Walker Decl.

23  ¶ 5 (explaining that LaBarbera gave defendants permission to use the Mytee trademark

24  for awhile and stated that it would help everyone out if there was a smooth transition,

25  particularly because Mytee still had in-house orders for the air movers).  Accordingly,

26  Mytee has failed to demonstrate that, as a matter of law, this alleged oral agreement

27  fails for lack of consideration.

28       Mytee also contends that this defense is barred by the statute of frauds, which

1  provides, *inter alia*, that an agreement "that by its terms is not to be performed within
2  a year from the making thereof" is not valid unless in writing.   Cal. Civ. Code
3  § 1624(a)(1).   As a prominent commentator explains, these words have been "literally
4  and narrowly interpreted."   1 Witkin, Summary of California Law, Contracts § 363.
5  He explains:

6

7   To fall within the words of this provision . . . , the agreement must be one
    of which it can truly be said *at the very moment it is made,* "This
8   agreement is not to be performed within one year'; in general, the cases
    indicate that *there must no be the slightest possibility that it can be fully*
9   *performed within one year.*" (White Lighting Co. v. Wolfson (1968) 68
    C.2d 336, 343, footnote 2, 66 C.R. 697, 438 P.2d 345, infra, § 367
10  [quoting Corbin]; Plumlee v. Poag (1984) 150 C.A.3d 541, 548, 198 C.R.
    66, citing the text; see Rest. 2d, Contracts § 130, Comment a.).

11

12  1 Witkin, Contracts § 363 (emphasis added).   In other words:

13

14   The contract is unenforceable  only where *by its terms* it is *impossible* of
    performance in the period.   If it is merely unlikely that it will be so
15   performed, or the period of performance is *indefinite*, the statute does not
    apply.
16

17  Id. at § 365.   Here, there is a genuine issue of fact as to whether the alleged oral license
18  was for an indefinite period.   See Walker Depo. at 28:3-4 (explaining that LaBarbera
19  told Walker "don't use it forever"); Walker Decl. ¶ 5 (explaining that although the
20  parties anticipated defendants' use of the Mytee trademark would be about one year,
21  "LaBarbera put no express time limit or other limitations" on defendants' use of the
22  Mytee trademark).   Thus, Mytee has failed to demonstrate as a matter of law that
23  evidence of the oral agreement is barred by the statute of frauds.

24      Mytee also contends that the agreement cannot be proved due to the parole
25  evidence rule.   In California, the parole evidence rule, codified in Code of Civil
26  Procedure § 1856(a), "prohibits a party from resorting to extrinsic evidence of a prior
27  or contemporaneous oral agreement to contradict a plain and unambiguous term of a
28  fully integrated agreement."   Charnay v. Cobert, 145 Cal.App.4th 170, 186 (2006).

However, "the parole evidence rule does not 'render inadmissible proof of contemporaneous oral agreements collateral to, and not inconsistent with, a written contract where the latter is either incomplete or silent on the subject, and the circumstances justify an inference that it was not intended to constitute a final inclusive statement of the transaction." Sicor Ltd. v. Cetus Corp., 51 F.3d 848, 859 (9th Cir. 1995).

Contract integration is an issue of law for the court. See Sullivan v. Massachusetts Mut. Life Ins. Co., 611 F.2d 261, 264 (9th Cir. 1979). In determining whether an agreement is integrated, the "crucial issue" is "whether the parties intended their writing to serve as the exclusive embodiment of their agreement." Masterson v. Sine, 68 Cal.2d 222, 225 (1968). In making this determination, the court may look to the writing itself. See id. For example, the writing may state "that 'there are no previous understandings or agreements not contained in the writing,' and thus express the parties' intention to nullify antecedent understandings or agreements." Id. at 225-26. However, the requirement "that the writing must appear incomplete on its face has been repudiated in many cases where parol evidence was admitted 'to prove the existence of a separate oral agreement as to any matter on which the document is silent and which is not inconsistent with its terms'-even though the instrument appeared to state a complete agreement. Id. Moreover, the "collateral agreement itself must be examined . . . to determine whether the parties intended the subjects of negotiation it deals with to be included in, excluded from, or otherwise affected by the writing." Id. "Circumstances at the time of the writing may also aid in the determination of such integration." Id.

Particularly instructive here is the case of Wright v. Title Insurance and Trust Company, 274 Cal.App.2d 252 (1969). In that case, Stricklen and Wright, who were co-owners of a corporation, entered into a written agreement that gave the survivor of the two the right to purchase the decedent's shares of corporate stock. Those two individuals had also entered into a contemporaneous oral agreement that they would

- 10 -

05CV2286

1   each take out a life insurance policy naming the other as the insured.  When Stricklen
2   died, Wright discovered Stricklen had breached the oral agreement by failing to
3   procure a life insurance policy naming Wright as a beneficiary.  Wright brought a
4   breach of contract action against Stricklen's estate, which defended the action partly
5   on the ground that evidence of the oral agreement was precluded by the parol evidence
6   rule. On appeal, Stricklen's estate argued that the trial court erred in allowing evidence
7   of this oral agreement.  The estate argued that had the parties intended to require the
8   purchase of mutual life insurance policies, such an agreement would have been
9   included in the buy and sell agreement, which identified the stock, the amount to be
10  paid and the time limits in which the stock could be purchased.   However, the court
11  of appeal affirmed, apparently agreeing, *inter alia*, with the plaintiff's position that the
12  trial court "was correct in its determination that the oral agreement to purchase life
13  insurance was separate, collateral, and consistent with the buy and sell agreement." Id.
14  at 260.

15        Here, the written Equipment Purchase Agreement was for the purchase and sale
16  of molds, the trademarks "Windstar" and "Windstorm," customer lists, computers,
17  workstations, bench tables, racks, and parts inventory.  See Equipment Purchase
18  Agreement ¶ 1. The Equipment Purchase Agreement states that "[t]his Agreement
19  constitutes the entire agreement between the parties *pertaining to the subject matter*
20  *contained in it* and supersedes all prior agreements, representations, and
21  understandings of the parties. No supplement, modification, or amendment of this
22  Agreement shall be binding unless executed in writing by all the parties." Id. ¶ 10
23  (emphasis added). Because the written agreement involves the sale of equipment and
24  the Windstar and Windstar trademarks while the oral agreement involves the temporary
25  use of the Mytee trademark, the court concludes that although the written agreement
26  is fully integrated with respect to "the subject matter contained in it," the parties did not
27  by this integration clause intend to preclude an oral agreement involving a different
28  subject matter – the temporary use of the Mytee trademark.  Moreover, the oral

1  agreement in no way contradicts the terms of the Equipment Purchase Agreement.

2  Thus, evidence of this separate, collateral agreement is not barred by the parol evidence

3  rule.

4       Finally, there are genuine issues of fact as to whether defendants engaged in

5  malfeasance so as to be precluded from relying on this defense.

6       *Defenses 23,25,29,32,35,37, and 38 and the doctrine of license estoppel*

7       Mytee, relying on the doctrine of license estoppel, contends that defendants are

8  precluded from asserting defenses such as naked licensing, abandonment, invalidity of

9  Mytee's mark and genericness in light of their claim that they had an oral license to use

10 Mytee's mark.  The doctrine of license estoppel provides that a "licensee is estopped

11 from claiming any rights against the licensor which are inconsistent with the terms of

12 the license." Westco Group, Inc. v. K.B. & Associates, Inc., 128 F.Supp.2d 1082, 1086

13 (N.D. Ohio 2001).  However, unless and until it is proven that defendants were

14 licensees – a proposition that Mytee vigorously contests – defendants are not precluded

15 from asserting these defenses. See Fed. R. Civ. P. 8(e)(2) (allowing the assertion of as

16 many defenses as the defendant has "regardless of consistency . . . .").

17       *Acquiescence (Twenty-Seventh Defense)*

18       Mytee also seeks summary judgment as to defendants' defense of acquiescence.

19 Acquiescence is an affirmative equitable defense that requires proof that the party

20 seeking to enforce its trademark rights has "unreasonably delayed pursuing litigation

21 and, as a result, materially prejudiced the alleged infringer," as well as proof of

22 "'conduct on the plaintiff's part that amounted to an assurance to the defendant, express

23 or implied, that plaintiff would not assert his trademark rights against the defendant.'"

24 Kellogg Co. v. Exxon Corp., 209 F.3d 562, 569 (6th Cir.2000) (quoting Elvis Presley

25 Enter., Inc. v. Elvisly Yours, Inc., 936 F.2d 889, 894 (6th Cir. 1991)); see also Creative

26 Gifts, Inc. v. UFO, 235 F.3d 540, 547-48 (10th Cir. 2000) (quoting Kellogg Co.).

27 Defendants present evidence from which a reasonable factfinder could find that Mytee,

28 by its conduct, assured defendants that it would not assert its trademark rights against

1  defendants for use of the Mytee mark during an unspecified period of time.  However,

2  defendants have failed to present any evidence from which a factfinder could find that

3  Mytee unreasonably delayed in pursuing this litigation or that any such delay materially

4  prejudiced defendants.  Accordingly, Mytee is entitled to summary judgment with

5  respect to this defense.

6  *Laches (Third Defense)*

7  Mytee seeks summary judgment on defendants' laches defense, contending that

8  such a defense "is precluded by defendants' actual trade on the goodwill of Mytee."

9  Memo of Points and Authorities at 18:16-17.  A defendant seeking to assert an

10  equitable defense such as laches must come to the court with "clean hands."  A

11  defendant who has prospered from his wrongdoing cannot assert the defense of laches.

12  See D.C. Comics, Inc. v. Powers, 465 F.Supp. 843, 849 (S.D.N.Y. 1978) ("Thus, under

13  the settled principles of equity defendants may not prosper from their own wrongdoing

14  and are precluded from asserting the defense of laches.").  However, because Mytee

15  has failed to demonstrate as a matter of law that defendants' use of the Mytee

16  trademark was wrongful and not authorized, Mytee has failed to demonstrate that, as

17  a matter of law, defendants cannot assert this defense.

18  *Unclean Hands (Ninth Defense)*

19  Mytee seeks summary judgment on defendants' defense of unclean hands.  "It

20  is a well-settled principle of trademark law that 'the defense of unclean hands applies

21  only with respect to the right in suit.'" Liz Claiborne, Inc. v. Mademoiselle Knitwear,

22  Inc. 13 F.Supp.2d 430, 445 (S.D.N.Y. 1998) (quoting Warner Bros. Inc. v. Gay Toys,

23  Inc., 724 F.2d 327, 334 (2d Cir.1983)).  Thus, where "unclean hands is raised as a

24  purported defense to a claim of trademark infringement, 'what is material is not that the

25  plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now

26  asserts.'"  Id. (quoting Project Strategies Corp. v. National Communications Corp.,

27  948 F.Supp. 218, 227 (E.D.N.Y.1996)).   As explained in Sears Roebuck & Co. v.

28  Sears plc, 744 F.Supp. 1297 (D.Del.1990):

> While bringing a lawsuit brings the contested issue before the court, the act of bringing suit is not, itself, the matter concerning which a plaintiff seeks relief. Thus, the Court must focus on alleged inequitable conduct in the gaining or the use of the right being contested, not alleged inequitable conduct in the bringing of the lawsuit.

Id. at 1310; see also 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 31:51 (4th ed.1998) ( "The act of bringing the lawsuit is not the subject matter concerning which plaintiff seeks relief. Unclean hands must relate to the getting or using the alleged trademark rights.").

Here, defendants have failed to present any evidence from which a factfinder could find that Mytee "dirtied its hands" acquiring the trademark rights it now seeks to assert. Accordingly, Mytee is entitled to summary judgment with respect to defendants' defense of unclean hands.

*Miscellaneous Defenses*

Mytee contends in a conclusory fashion that is entitled to summary judgment as to defenses 1 through 10, 12, 16, 17, 21, 23 through 47. Mytee has failed to meet its summary judgment burden with respect to these defenses.

### C.   Summary Judgment as to Mytee's state law claim for unfair competition

Mytee seeks summary judgment on its state law claim for unfair competition. As Mytee correctly notes, "[a]n action for unfair competition under Cal. Bus. & Prof. Code §§ 17200 et seq. is 'substantially congruent' to a trademark infringement claim under the Lanham Act." Academy of Motion Picture Arts and Sciences v. Creative H, 1457ouse Promotions, Inc. 944 F.2d 1446 (9th Cir. 1991) (quoting International Order of Job's Daughters, 633 F.2d 912, 916 (9th Cir. 1980)).   For the reasons there are genuine issues of material fact precluding summary judgment on Mytee's Lanham Act claims, there are genuine issues of material fact precluding summary judgment with respect to its state law unfair competition claim.

**D.    Summary Judgment as to Mytee's claim for misappropriate of trade secrets**

Under California law, a plaintiff may obtain an injunction and damages for misappropriation. See Cal. Civ. Code §§ 3426.2 and 3426.3. "Misappropriation" means

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> (A) Used improper means to acquire knowledge of the trade secret; or
>
> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
>
>> (i) Derived from or through a person who had utilized improper means to acquire it;
>>
>> (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>
>> (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Cal.Civ.Code § 3426.1(b).  A "trade secret" is "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d).

First, Mytee contends that defendants misappropriated their trade secrets by "acquir[ing] a valuable solicitation list of Mytee's *potential* customers." Memo. of

- 15 -

1   Points & Authorities at 20:8-9 (emphasis added). In support of this contention, Mytee
2   points to an email from Shoemaker to Viking that was sent while Shoemaker was a
3   Mytee employee. In that email, Shoemaker stated: "Hello Mickey, here is a list of all
4   of the DriEaz distributors that are posted on their website. You did not get this from
5   me." Mytee also presents the declaration of Nathan Pepper, who states that the list of
6   Dri-Eaz distributors that Shoemaker emailed was prepared by Pepper "by reviewing
7   Dri-Eaz's web site and manually preparing a comprehensive list of all of its
8   distributors, with address and contract information, listed on its website." Pepper Decl.
9   ¶ 20. The list was prepared so Mytee could "easily and quickly place solicitation calls
10   to each of [Dri-Eaz's] distributors on the list in order to generate business for Mytee."
11   Id.

12          Certainly, a customer list *may* be a trade secret subject to misappropriation. See
13   American Paper & Packaging Products, Inc. v. Kirgan, 183 Cal.App.3d 1318, 1324
14   (1986). However, under these facts, Mytee has failed to demonstrate as a matter of law
15   that *this* list was a trade secret, let alone *its* trade secret. The list was not of Mytee's
16   customers but, rather, of another company's customers, and the information comprising
17   the list was obtained from a website accessible to all. Although a Mytee employee
18   compiled the information for its own use, the fact remains that the information was
19   originally on a website accessible to the world. As noted *supra*, a trade secret is
20   information that derives value "from not being generally known to the public or to
21   other persons who can obtain economic value from its disclosure or use." Cal. Civ.
22   Code § 3426.1(d). There are genuine issues of fact as to whether this information, taken
23   from a website viewable by the public, was information that was valuable because it
24   was not "generally known." Cf. American Paper, 183 Cal.App.3d at 1326 (finding it
25   "difficult to find a protectable trade secret" on a motion for preliminary injunction
26   because "[w]hile the information sought to be protected here, that is lists of customers
27   who operate manufacturing concerns and who need shipping supplies to ship their
28   products to market, may not be generally known to the public, they certainly would be

1  known or readily ascertainable to other persons in the shipping business").

2      Moreover, as noted *supra*, to be liable for misappropriation based upon the
3  acquisition of a trade secret, one must "know[] or ha[ve] reason to know *that the trade*
4  *secret was acquired by improper means*." Cal.Civ.Code § 3426.1(b)(1) (emphasis
5  added). Here, there are genuine issues of material fact as to whether defendants knew
6  or had reason to know that this list was acquired by improper means. Importantly,
7  "improper means" includes "theft, bribery, misrepresentation, breach or inducement of
8  a breach of a duty to maintain secrecy, or espionage through electronic or other
9  means." Ann.Cal.Civ.Code § 3426.1(a).   *"Reverse engineering or independent*
10 *derivation alone shall not be considered improper means."* Id. Although Shoemaker's
11 email stated "You did not get this from me," which Mytee contends should have alerted
12 defendants to the fact that the list was obtained by improper means, the email did not
13 suggest that the list in its current form was created by or obtained from Mytee by
14 Shoemaker. Rather, the email simply stated that the list was of distributors posted on
15 Dri-Eaz's website. A reasonable factfinder could find that defendants believed that the
16 list was either directly obtained from a public website or that it was created by
17 Shoemaker using information from a public website. Therefore, a reasonable factfinder
18 could find that defendants did not know or have reason to know that the list was
19 acquired by improper means.

20     Mytee also seeks to hold defendants liable for misappropriation based on the fact
21 that its former employee, John Shoemaker, who is not a defendant in this action,
22 emailed himself a list of all of Mytee's customers and a list of information showing
23 Mytee's manufacturing costs immediately prior to leaving Mytee's employ to work for
24 defendants. However, there are genuine issues of fact as to whether defendants
25 themselves every acquired, disclosed or used this trade secret information. Although
26 Mytee contends that Shoemaker was defendants' "partner and agent," and, therefore,
27 his acquisition of this information can and should be attributed to defendants, there are
28 genuine issues of fact as to Shoemaker's relationship with defendants that preclude a

05CV2286

1  finding that Shoemaker's actions can, as a matter of law, be attributed to defendants for
2  purposes of imposing liability for misappropriation. <u>See</u> Exhibit 1, Walker Depo.
3  135:4-25; 150:1-151:10; 170:9-177:5; Exhibit 2, Pardus Depo. 21:17-22:18; 28:16-
4  31:13; 32:7-33:10; 34:13-25; Exhibit 3, Shoemaker Depo. 40:1-42:23; 78:20-19:15;
5  116:16-126:25; 149:11-150:9; Walker Decl. ¶ 6. Thus, Mytee is not entitled to
6  summary judgment with respect to its state law claim for misappropriation of trade
7  secrets.

8      E.      **Summary Judgment as to defendants' defenses related to the**
                **claim for misappropriation of trade secrets**
9
10         Mytee seeks summary judgment on defendants' defenses of unprotected
11 disclosure (fortieth defense) and no independent economic value (forty-first defense).
12 With respect to defendants' defense of unprotected disclosure, Mytee contends that
13 defendants have no evidence that Mytee failed to take reasonable steps to protect its
14 confidential information. Defendants have failed to present any evidence from which
15 a reasonable factfinder could find that Mytee failed to take reasonable steps to protect
16 its confidential information. Accordingly, Mytee is entitled to summary judgment with
17 respect to this defense.

18         With respect to defendants' defense that the confidential information alleged to
19 be a trade secret has no independent economic value, Mytee notes that defendants
20 admitted that the Dri-Eaz distributor list was valuable because it could be used to
21 solicit customers. Defendants do not address this argument in their opposition.
22 Accordingly, Mytee is entitled to summary judgment with respect to defendants' this
   defense.

23     F.      **Permanent Injunctive Relief**
24
25         Finally, within the context of this summary judgment motion, Mytee seeks
26 permanent injunctive relief. Specifically, Mytee seeks an injunction from the court
27 requiring, *inter alia*, defendants to recall all of their airmovers. Because Mytee has
28 failed to demonstrate that it is entitled to summary judgment with respect to any of its
   claims, it has failed to demonstrate it is entitled to a permanent injunction.

1  Accordingly, its request for a permanent injunction is denied.

2  **IV.   Conclusion**

3      Mytee's motion for partial summary judgment is granted in part and denied in

4  part as more fully set forth above.

5      **IT IS SO ORDERED.**

6

7  DATED:  6 | 18  ,2006

8                                        JOHN S. RHOADES, SR.
                                         United States District Judge
9  cc:      All parties

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

05CV2286