# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MYTEE PRODUCTS, INC., a California corporation, and JOHN LaBARBERA | CASE NO.  05 CV 2286 MMA(CAB) |
| Plaintiff, | **MEMORANDUM OF DECISION** |
| v. | **[FED. R. CIV. P. 52(A)(1)]** |
| H.D PRODUCTS, INC. d.b.a. HIGH DESERT PRODUCTS, a corporation, et. al., | |
| Defendants. | |

This action for trademark infringement, unfair competition, injunction, and misappropriation of trade secrets came on regularly for court trial on March 25, 26, and 30, and April 1, 2, 6, 7, 8 and 9, 2009, before the Honorable Michael M. Anello, United States District Judge, presiding without a jury.  Plaintiffs appeared through their counsel, Daniel J. Kessler, Esq., and Benjamin R. Secoff, Esq., of the firm of Kessler & Seecof, LLP, and Defendants appeared through their counsel, James A. McQueen, Esq., of the firm of McQueen & Ashman, LLP.  Witnesses were sworn and called to testify; documents and

1

other exhibits were offered and received in evidence; oral closing arguments were presented on behalf of both sides; written closing briefs were submitted thereafter by both sides on April 24, 2009; and the court then took the matter under submission.  The court now issues its Memorandum of Decision,[1] as follows:

## Introduction

Plaintiff Mytee Products, Inc. (hereafter "Mytee") manufactures carpet and floor-cleaning machines, and related products, which it sells nationally and internationally, primarily through a network of distributors.  Among the products it manufactures is a class of machines known as "air movers," which are industrial fans used for drying wet floors and carpets. It uses the name "Mytee," which it has registered as a federal trademark, in advertising and promoting its products throughout the United States.   Plaintiff John LaBarbera (hereafter "LaBarbera") is the President and principal shareholder of Mytee.

Defendant H. D. Products, Inc. (hereafter "H. D. Products") is a distributor of carpet cleaning chemicals.  Defendant Mark S. Walker (hereafter "Walker") is the President and principal shareholder of H. D. Products.   Pacific Sales & Marketing (hereafter "Pacific Sales") is an unincorporated business entity (apparently a partnership) operated by Walker and Defendant Charles Pardus (hereafter "Pardus") which sells janitorial supply products.   In or about 2002, Pacific Sales became a manufacturer's representative for Mytee and began selling various Mytee products, including its air movers.  Defendant MC Viking Equipment Co., Inc. (hereafter "Viking") is a corporation formed on May 12, 2004

---

[1] This opinion constitutes the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.

(the date its Articles of Incorporation were filed, although stock was not issued and corporate by-laws and minutes were not prepared until approximately two years later) which manufactures and sells air movers and related products.  Walker and Pardus are the principal officers, directors, and shareholders of Viking.

### Factual Background

In or about early 2004, Mytee decided to sell off its "squirrel-cage" (a particular type of air mover using a cylinder-shaped fan) air mover business, including the molds and associated equipment and inventory for its "Windstar" and "Windstorm" models (and apparently also for its "Mytee-Dry" model).  Walker and Pardus, then doing business as Pacific Sales, were solicited as potential buyers by Mytee's sales manager (John Perez, aka John Shoemaker, hereafter "Perez/Shoemaker").   The sale was ultimately consummated pursuant to an "Equipment Purchase Agreement" (Exhibit 7) executed on April 30, 2004.  The agreement identified H. D. Products, Inc. as the "Buyer," and Mytee Products, Inc. as the "Seller."  LaBarbera signed the agreement on behalf of Mytee, and Walker signed the agreement on behalf of H. D. Products.  Pardus did not sign the agreement, presumably because he was not an officer of H. D. Products, but, for reasons not explained adequately at trial, he did initial several pages of the agreement.  The total purchase price specified in the agreement was $170,000 (including $100,000 for "the molds, customer list, computers, workstations, tables, racks and trademarks," and $70,000 for specified items of "inventory.")

Several months later, in or about November 2004, an "Amendment to Equipment Purchase Agreement" (Exhibit 29) was signed, which purported to change the name of the "Buyer" from H. D. Products to "Mark Walker and Chuck Pardus, who assume all

obligations of H. D. Products, Inc. under the Equipment Purchase Agreement."   The Amendment also allocated the purchase price between and among the various assets purchased, presumably for tax reporting purposes.   This "Amendment" was signed by LaBarbera on behalf of Mytee, Walker on behalf of H. D. Products, and Walker and Pardus on behalf of themselves as individuals.   Viking was not mentioned in the Amendment, even though, as noted above, its Articles of Incorporation had been filed on May 12, 2004.

Neither of these two written agreements mentioned the "Mytee" registered trademark, nor did they state whether the "Buyer" and/or its assignees, if any, were authorized to use the "Mytee" name.  Walker and Pardus claim, however, that there was a contemporaneous oral agreement, entered into at the time the "Equipment Purchase Agreement" was signed on April 30, 2004, whereby LaBarbera authorized (and in fact encouraged) them to use the "Mytee" name for some undefined period of time (but "not forever") to smooth the transition from one company to the other in marketing the Mytee air movers, and to assist them in making a success of their start-up business. Walker testified at trial that he assumed that about 18 months or so would be adequate for this purpose.   (Notwithstanding that testimony, the court deems it admitted by Defendants, for the purposes of this trial, that any authority they may have had to use the Mytee name terminated as of April 30, 2005.  See, e.g., Pre-Trial Conference Order "Admitted Facts" 34 and 49.)   LaBarbera specifically denies that there ever was any agreement, oral or otherwise, authorizing Defendants, or any of them, to use the "Mytee" name for any period of time.

Following Mytee's sale of its "squirrel-cage" air mover line pursuant to the April 30,

2004 "Equipment Purchase Agreement," Viking began to manufacture and market the Windstar and Windstorm "squirrel-cage" air movers under the "Mytee" name (which appeared on labels on the air movers themselves, and in various marketing brochures and internet web pages).  By all accounts, it appears that Viking was quite successful in this effort.  As noted in "Admitted Facts" 46-48 in the Pre-Trial Conference Order, it appears that Viking sold over 45,000 air movers between April 30, 2004, and February 23, 2006, and that its total revenues for the sale of "non-private label" air movers (i.e., those not made for specific customers using their own logos and labels) was at least $3,114,009 through July 13, 2006.

Defendants contend that they began phasing out the use of the "Mytee" name well within 18 months from the date of sale, as they had planned and as their start-up business became established in the industry.  For instance, on February 3, 2005, Viking notified its label supplier (Central Label) to "delete the Mytee label on the switch plate," and that in the next order it would "advise with a new logo for Viking."  (Exhibit QN).  Other evidence presented showed that its last order for "Mytee" labels (Part No. L816) was on February 23, 2005, and that all subsequent label orders were either for private customer labels or for Viking labels (Part No. L902).  (Exhibit DI).  Likewise, its advertising began phasing out the use of the "Mytee" name in or about April 2005 (see, e.g., Exhibits AD and AE), and, within a few months thereafter, even the "Windstar" and "Windstorm" logos were discontinued, and its newly manufactured air movers began carrying the "Viking Equipment—Centrifugal Air Mover" label.  (Exhibit AJ). Plaintiffs produced one "Mytee Windstar" air mover at trial which showed on its label that it was manufactured by Viking on June 24, 2005 (although Viking claims that the machine was manufactured

earlier, and a that a newer label was placed on an older machine just to extend the warranty for the customer), but no evidence was presented showing that Viking manufactured any air movers using the "Mytee" name after that date.

Viking concedes, however, that at least two exceptions exist to its claimed efforts to discontinue all use of the "Mytee" name by May 2005.  One such "exception" is its "July 2005 Air Mover Special" advertisement which shows a picture of an air mover with the Mytee Windstar label, although there is no mention of Mytee in the text (Exhibit 48).  The other such "exception" is its own website launched in June 2005 which includes some photos of air movers with the "Mytee" logo and some text regarding the history of the Mytee air mover (Exhibit 54).  It claims, however, that those "exceptions" resulted only from its inadvertence in failing to remove old photos and old text from its marketing materials.

Viking also concedes that some of its distributors continued (for a period of time after May 2005) to use old marketing brochures and web pages showing the "Mytee" name on Viking's air movers.  For instance, Exhibits 75, 80, 85, and 95 contain copies of internet web pages and other advertising materials showing that some of its distributors were continuing to associate the "Mytee" name with Viking's air movers until as recently as August 2007.  Viking claims, however, that it has no control over the activities of its independent distributors, who apparently continued to use old photos and old text in their marketing materials.

As noted above, LaBarbera contends that there was no agreement authorizing Defendants, or any of them, to use the trademarked "Mytee" name for any period of time, and on that basis claims, among other things, entitlement to the disgorgement of

all profits received by Defendants from the allegedly infringing sales of air movers under the "Mytee" name from May 1, 2004, to the present.  He contends that he was not aware that Viking was selling air movers under the "Mytee" name until August 4, 2005 when Nathan Pepper, now Mytee's General Manager, discovered the Viking website (Exhibit 54) after doing a "Google" search for "Windstorm" and "Windstar" air movers.  On that same date, LaBarbera instructed his attorney to send a "cease and desist" letter (Exhibit 55) to Walker.   Plaintiffs concede that Viking's website was shut down that day in response to the "cease and desist" letter, although, as noted above, it appears that some distributors continued to market Viking's air movers (using the Mytee name) for some period of time thereafter.

Defendants take issue with LaBarbera's claim that he didn't know Viking was manufacturing and selling air movers under the "Mytee" name until August 4, 2004.  In addition to the claimed oral agreement mentioned above, Defendants contend that LaBarbera's conduct, and the conduct of other representatives of Mytee, show that they not only knew that Defendants were using the "Mytee" name, but in fact encouraged them to do it.   For example, Walker and Pardus testified that they were introduced at a sales meeting (hosted by Mytee in San Diego in or around September 2004) as the purchasers and new owners of the Mytee air mover line, and that they handed out their new marketing brochure (Exhibit 20) at that meeting.   That new marketing brochure clearly displayed the Mytee Windstorm and Windstar air movers as being marketed by "Mytee Viking Equipment Company."   LaBarbera recalls, on the other hand, that he attended that sales meeting for only two hours or so, and that he saw no such brochures being distributed.  In addition, Plaintiffs called two other witnesses (Jay Klang and

George Kline) who testified they also were at that meeting, and that they saw no such brochures being distributed.

As another example, Walker and Pardus testified that they were invited by Mytee to share Mytee's booth at the annual ISSA trade show in New Orleans, Louisiana, in November 2004.  While there, Mytee purchased their trade show badges for them, gave them "Mytee" polo shirts to wear, and assisted them in exhibiting their "Mytee" air movers.  (See, e.g., Exhibits GS, GT, and GU.)  Plaintiffs apparently do not dispute that evidence, but contend that it does not establish that Defendants were given the authority to use the "Mytee" name.

In light of the foregoing, it appears to the court that the primary issues presented for determination regarding Plaintiffs' trademark infringement claim are:   (1) were Defendants, or any of them, authorized by Plaintiffs, or either of them, to use the "Mytee" name, and if so, for what period of time; (2) if trademark infringement liability is established, what is the appropriate measure of monetary relief here (e.g., unjust enrichment/disgorgement of profits, reasonable royalty, and/or other compensatory damages, and/or entitlement to treble damages for allegedly "intentional" conduct), and in what amount and payable by whom; and (3) are Plaintiffs, or either of them, entitled to injunctive relief as against Defendants, or any of them, and if so, with regard to what conduct and for what period of time?  Each of these issues is discussed more fully herein below.

It appears to the court, and the parties seem to agree, that the resolution of Plaintiffs' Trademark Infringement claim (First Claim for Relief) will also resolve Plaintiffs' Unfair Business Practices claim (Second Claim for Relief).  *See, e.g., Academy of Motion*

*Picture Arts and Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir. 1991) (confirming that an action for unfair competition under California Business & Professions Code §§ 17200, et seq., is "substantially congruent" to a trademark infringement claim under the Lanham Act) (internal citations omitted).   Likewise, it appears to the court that resolution of Plaintiffs' Trademark Infringement claim will also resolve Plaintiffs' Injunction claim (Third Claim for Relief), since the injunctive relief sought there relates to the claimed trademark infringement.   Accordingly, the unfair business practices and injunction claims will not be analyzed separately at length herein.

Plaintiffs' Misappropriation of Trade Secrets claim (Fourth Claim for Relief) is based primarily upon the alleged conduct of Perez/Shoemaker.  Briefly stated, Plaintiffs contend that Perez/Shoemaker (who remained an employee of Mytee until May 2005) became a "partner" of Walker and Pardus (and/or an owner or principal of Viking) in or about April 2004, when he wrote them a $4000 check as a down payment for a future ownership interest in Viking.   Plaintiffs contend further that Perez/Shoemaker wrongfully divulged some of Mytee's "trade secrets" and other confidential information to Defendants between April 2004 and May 2005 (i.e., during the time that he was allegedly Defendants' "partner" or "agent," but still employed by Mytee), including Mytee's customer lists (Exhibits 41 and 42), the "Dri-Eaz distributor list" (Exhibit 38), the "Tradewinds axial fan parts list" (Exhibit 39), Mytee's "customer leads" from the ISSA trade show in New Orleans (Exhibit 31), and Mytee's "pricing information" (Exhibit 43).  Plaintiffs contend that this alleged trade secret/confidential information was either actually received by Defendants, or, alternatively, that it was received by their "partner" or "agent" (i. e., Perez/Shoemaker), and thus constructively received by them.

Briefly stated, Defendants deny that Perez/Shoemaker was ever their "partner" or "agent" during the subject time period, and/or that they ever received any of Mytee's trade secrets or confidential information.  Alternatively, they contend that even if they did receive some of the information at issue, what they received was neither "confidential" nor a "trade secret."

In light of the foregoing, it appears to the court that the primary issues presented for determination regarding Plaintiffs' misappropriation of trade secrets claim are:  (1) was Perez/Shoemaker a "partner" or "agent" of Defendants, or any of them, during the subject time period; (2) did Defendants, or any of them, actually receive the  information claimed by Plaintiffs to be "trade secrets"; and (3) if so, does any of the information at issue qualify as a "trade secret."  Each issue is discussed more fully herein below.

**I**

**Trademark Infringement/Unfair Competition**

In order to succeed on a claim for trademark infringement under the Lanham Act (15 U.S.C. §§ 1111, et seq.), Plaintiffs must establish three basic elements:  (1) ownership of the trademark in issue; (2) use by the defendant, without authorization, of the subject mark in connection with the sale, distribution or advertising of goods or services; and (3) that defendant's use of the mark is likely to confuse, or to cause mistake or to deceive. 15 U.S.C § 1114(1); *Toho Co., Ltd. v. William Morrow & Co., Inc.*, 33 F.Supp.2d 1206, 1210 (C.D. Cal. 1998) (citing *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1288, n.2). Likewise, in order to succeed on a claim for unfair competition under 15 U.S.C. § 1125, Plaintiffs must establish essentially the same elements.  *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988) ("The 'ultimate test' for unfair competition is

exactly the same as trademark infringement.")

Defendants concede that the name "Mytee" is a registered federal trademark owned by Plaintiff Mytee Products, Inc. (see Exhibits 72 and 78), and thus no further proof is required as to element (1) above.  While Defendants do not concede element (3) above (i.e., that their "use of the mark is likely to confuse . . . ."), they did not seriously contest it at trial.  When, as here, the defendants use a mark identical to that of the plaintiffs, the burden of proof to establish that there was no likelihood of confusion shifts to the defendants. *See*, *e.g., Surgicenters of America, Inc. v. Medical Dental Surgeries Co.*, 601 F.2d 1011, 1021 (9th Cir. 1979).  Moreover, "[i]n the Ninth Circuit, a defendant's knowing adoption of a mark similar to the plaintiff's raises a presumption of confusion." *American Honda Motor Co., Inc. v. Pro-Line Protoform*, 325 F.Supp.2d 1081, 1084 (C.D.Cal. 2004) (internal citations omitted); *see also*, *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 354 (9th Cir. 1979).  In any event, there was evidence at trial showing actual confusion, including, but not limited to, the distributor advertisements referenced above (e.g., Exhibits 75, 80, 85, and 95), and the testimony of Albert Perrin to the effect that when a consumer orders a "Mytee" air mover from certain distributors (e.g., Michigan Maintenance or Rotovac), the consumer receives an air mover manufactured by Viking. In light of the foregoing, the court finds that element (3) above has been established.

However, as to element (2) above (i.e., use by Defendants "without authorization"), the court finds that Defendants did have permission from LaBarbera, on behalf of Mytee, to use the subject trademark (i.e., the "Mytee" name) for a period of one year from May 1, 2004 through April 30, 2005.  The court recognizes some difference of opinion between the parties here as to which side bears the burden of proof on this

issue.  Plaintiffs concede that in the normal course the burden of proof for trademark infringement is borne by the plaintiff, but they contend here that ". . . because defendants assert an oral license, the burden shifts to defendants to prove authorization and it is not plaintiffs' burden to prove defendants did not have permission."  (Plaintiffs' "Memorandum of Contentions of Fact and Law," p. 11, citing *Grey v. Campbell Soup Co.*, 650 F.Supp2d 1166, 1168 (C.D.Cal. 1986), and *World Championship Wrestling, Inc. v. GJS Intern., Inc.* 13 F.Supp.2d 725, 733-734 (N.D.Ill. 1998).  Defendants, on the other hand, contend that "[o]ne of the elements required to succeed on a claim for trademark infringement or unfair competition is that use by defendant of the mark was without authorization or consent."  (Defendants' Memorandum of Facts and Contentions of Law, p. 3, citing *Toho Co., Ltd. V. William Morrow and Co., Inc.* 33 F.Supp. 1206, 1210 (C.D.Cal. 1998).  It appears that Plaintiffs are correct, and that the burden of proof shifts to Defendants on this issue.  For the reasons discussed below, the court is satisfied that Defendants have established that they had permission to use the "Mytee" name for one (1) year from May 1, 2004, until April 30, 2005.

However, for the reasons also discussed below, the court finds that Defendants continued to use the "Mytee" name after April 30, 2005, and that their use after that date was "without authority" (as Defendants have admitted in their pretrial Responses to Requests for Admissions, and in "Admitted Facts" 34 and 49 in the Pre-Trial Conference Order filed herein on January 14, 2008).  In light of the foregoing, element (2) above has been established by Plaintiffs, but only with respect Defendants' use of the "Mytee" name after April 30, 2005.

///

**A.      Oral License Agreement**.

As noted above, Walker and Pardus testified that an oral agreement was entered into between them and LaBarbera on April 30, 2004, contemporaneous with the execution of the "Equipment Purchase Agreement" (Exhibit 7).  Although they couldn't quote LaBarbera's words exactly, they both recalled that he urged them to "use the name to help you get started—don't use it forever, but use it," or words to that effect.  They also recall him saying that their use of the "Mytee" name would help make a smooth transition in transferring the air mover line from one company to the other, and thus would benefit both companies, or words to that effect.  They also recall a discussion about labels for the air movers, and they recall that LaBarbera told Diane Robertson, then an employee of Mytee who was present for the signing of the purchase agreement, to give them all the "Mytee" labels and anything else that had to do with the Mytee air mover product line.  Following that direction from LaBarbera, they recall that all of the existing "Mytee" labels were then loaded onto the truck along with the molds and the other equipment being purchased.  In their view, this was completely consistent with the oral agreement authorizing them to use the "Mytee" name.  LaBarbera, on the other hand, denies that Defendants were given any "Mytee" labels.

As also noted above, LaBarbera denies that any such agreement was reached. Importantly, however, Diane Robertson (Mytee's former accounting manager, and the only other person present at the signing of the purchase agreement other than the parties to the agreement) confirmed that there was a discussion of the use of the "Mytee" name.  Although she couldn't quote the words spoken, she recalled that someone (either Walker or Pardus) said "is there going to be a problem using the Mytee

name," or words to that effect, and that LaBarbera then stated in response "No, that will not be a problem," or words to that effect.  No evidence was offered at trial which would tend to suggest that Diane Robertson was anything other than a credible witness. LaBarbera, on the other hand, denies making the statement attributed by him by Diane Robertson, claiming that he responded as follows:  "No. Mytee is a registered trademark. That's our name. You can't use that . . . ," or words to that effect.

Notwithstanding that denial, the subsequent conduct of LaBarbera and other Mytee employees and agents tends to confirm the existence of the subject agreement to allow Defendants to use the "Mytee" name.  As an initial example, Mytee's then Sales Manager (Perez/Shoemaker) sent out a letter dated June 7, 2004 (Exhibit EA) to all Mytee distributors, stating, in pertinent part, as follows:  "The airmover business has been sold to Viking Equipment.  Viking Equipment will continue to produce airmovers under the Mytee Windstar and Windstorm Label.  This will help in making a seamless transition for you and your customers."

As another example, both Walker and Pardus testified that they were invited to a sales meeting in San Diego hosted by Mytee in or about September 2004, where they were introduced by LaBarbera himself as "the new owners of the Mytee air mover line," or words to that effect.  They testified further that they handed out their new glossy brochure (Exhibit 20) at that sales meeting, which contained pictures of "Mytee Windstar" air movers, and which identified their company as "Mytee Viking Equipment Co." Consistent with that testimony, Defendants called a presumably independent witness (Merrill Morgan, a manufacturer's representative) who testified that he also attended that sales meeting and that he observed Walker and Pardus handing out their new

brochure (Exhibit 20) to all the Mytee distributors and manufacturers' representatives present at the meeting.  He also testified that he overheard a conversation between LaBarbera and a distributor or manufacturer's rep named George Bauer, in which Bauer said "It's mighty nice of you to let Viking use the Mytee name," to which LaBarbera responded by holding up the new brochure (Exhibit 20), and saying "We want Mickey and Chuck to be successful," or words to that effect.  No evidence was presented suggesting that Mr. Morgan was anything other than a credible witness.  Moreover, Debra Durling (who at that time was Mytee's Senior Customer Care Representative) testified that she also attended that meeting, and not only did she see Walker and Pardus handing out the new brochure (Exhibit 20), but she actually had a conversation with Perez/Shoemaker (who at that time was Mytee's Sales Manager) about it, during which they both agreed that it was "a great looking flyer," or words to that effect.

As another example, both Walker and Pardus testified that they were invited to share Mytee's booth at the November 2004 annual ISSA trade show in New Orleans, where they displayed their Mytee Windstar and Windstorm air movers and associated sales materials.  Mytee purchased their trade show badges for them (see, e.g., Exhibit GT, identifying Pardus as a "Sales Associate" for Mytee Products, Inc.), arranged to have their air movers  (bearing "Mytee" labels) shipped to the trade show for them (Exhibit GS), and even provided them with "Mytee" labeled polo shirts to wear (Exhibit GT).  Debra Durling (Mytee's then Sr. Customer Care Rep) was at the trade show also, and she confirmed that Walker and Pardus were present in the Mytee booth exhibiting their Mytee Windstar and Windstorm air movers.  She also testified that it was she who sent in the registration forms and paid the registration fees for Walker and Pardus (see Exhibit OO—Registration

Forms, identifying both Walker and Pardus as "Sales Associate," with an e-mail address of "sales@mytee.com").

In light of the foregoing, the court finds that Defendants were "authorized" by LaBarbera and Mytee to use the Mytee name for some undefined period of time, and that LaBarbera and Mytee (through its officers and authorized representatives) knew all along that Defendants were using the Mytee name.

**B.      Consideration**.

While the Lanham Act defines a trademark infringement claim in terms of use of another's mark "without authorization," Plaintiffs engage in a legal "contract" analysis, asserting, among other things, the absence of legal "consideration" for the subject "oral agreement" regarding use of the "Mytee" name.  To the extent that a legal contract analysis is appropriate here, the court finds that the subject oral agreement was supported by adequate "consideration."  Although no money was paid by Defendants, the evidence supports a conclusion that a benefit was received by Plaintiffs.

As noted above, there was testimony that LaBarbera explained at the time of the agreement that Defendants' use of the Mytee name for a period of time would benefit both parties by creating a smooth transition for the transfer of the air mover line from one company to the other.  Likewise, Perez/Shoemaker confirmed in his June 7, 2004 letter to all Mytee distributors (Exhibit EA) that "this will help in making a seamless transition for you and your customers."  In addition, there was evidence that Myee expected to be relieved of some warranty work on its previously manufactured air movers by referring any future claims to Defendants.  Beyond that, and as a general proposition, it appears that both parties here believed that success by Defendants in manufacturing and selling

air movers under the "Mytee" name would benefit Mytee by continuing to promote its name in the janitorial/restoration industry.

Alternatively, even if the evidence does not support the existence of legal consideration, it would support a finding that Plaintiffs should now be estopped from asserting lack of consideration as a defense due to their subsequent conduct, as discussed more fully hereinabove, and due to Defendants' detrimental reliance thereon.

**C.    Statute of Frauds.**

Plaintiffs also contend that the subject oral agreement is unenforceable under the "Statute of Frauds" (Cal. Civ. Code § 1624) since it was not intended to be performed within one (1) year.   However, in order for the so-called statute of frauds to apply here, Plaintiffs have to show that it was impossible to perform the subject agreement within one (1) year.  *See, e.g.*, 1 Witkin, Summary of California Law, Contracts § 63, citing *White Lighting Co. v. Wolfson*, 68 Cal.2d 336, 343, fn.2 (1968) (citing 2 Corbin on Contracts, § 444, at pp. 534-535).  Plaintiffs can not make that showing here.

Alternatively, as noted above in connection with the lack of consideration argument, even if the so-called statute of frauds could be applied here, the evidence supports a finding that Plaintiffs should now be estopped from asserting it as a defense due to their subsequent conduct, and due to Defendants' detrimental reliance thereon.

**D.    Parol Evidence Rule/Integrated Contract**.

Plaintiffs also contend that the initial "Equipment Purchase Agreement" (Exhibit 7) is an "integrated" contract, which precludes recognition and enforcement of the "oral agreement" at issue herein.    Plaintiffs rely upon the so-called "integration clause" contained in the subject "Equipment Purchase Agreement" (Exhibit 7, at p. 4, para. 10),

which provides that "[t]his agreement constitutes the entire agreement between the parties **pertaining to the subject matter contained in it** . . . ." [Emphasis added.]   The "subject matter" of the agreement is the purchase of air mover molds and other associated inventory and equipment as described in Paragraph I of the agreement. There is no mention in that agreement of the purchase of the Mytee trademark, or of any agreement to use (or not use) the Mytee name.  Accordingly, the so-called "integration clause" by its very terms does not preclude recognition and enforcement of the subject oral agreement.   Nor is the so-called "parol evidence rule" implicated here.   As confirmed in *Sicor Ltd. V. Cetus Corp*, 51 F.3d 848, 859 (9th Cir. 1995), "the parol evidence rule does not render inadmissible proof of contemporaneous oral agreements collateral to, and not inconsistent with, a written contract where the latter is either incomplete or silent on the subject, and circumstances justify an inference it was not intended to constitute a final inclusive statement of the transaction." (citing *Ellis v. Klaff* (1950) 96 Cal.App.2d 471, 476).

**E.     Contracting Parties**.

       Plaintiffs also contend that the alleged oral agreement is unenforceable (or, alternatively, that it should not be recognized at all) due to a lack of certainty as to the identity and capacity of the contracting parties.

       With the benefit of hindsight, the court recognizes the existence of some initial uncertainty (and/or lack of clear documentation) in identifying the true parties to the various agreements and transactions at issue here.   For instance, while the initial "Equipment Purchase Agreement" (Exhibit 7) designated Mytee Products, Inc., as "Seller," and H.D. Products, Inc., dba High Desert Products, as "Buyer," the allegedly

contemporaneous "oral agreement" for use of the "Mytee" name seems to have been between LaBarbera on the one hand, and Walker and Pardus on the other hand, as individuals.   To complicate matters a bit more, the initial invoice documentation evidencing the purchase of the molds and associated inventory and equipment (Exhibits 8 and 9) identified the buyer (or "Customer") as Pacific Sales & Marketing, which appears to be a partnership between Walker and Pardus. Then the "Amendment to Equipment Purchase Agreement" (Exhibit 29), apparently executed in or about November 2004, purported to change the name of the "Buyer" to "Mark Walker and Chuck Pardus" as individuals.   And although MC Viking Equipment Co., Inc., was formed in the interim by the filing of Articles of Incorporation on May 12, 2004 (Exhibit D—although bylaws and minutes were not prepared, and stock was not issued, until approximately two years later), there was no mention of it in any of these agreements between the parties. Notwithstanding that, sales documentation generated by Viking Equipment Co. shows that it began selling the Mytee Windstar and Windstorm air movers as early as May 7, 2004 (Exhibit 10), although there was no documentation (at least none was presented at trial) evidencing any formal assignment, sale, or other transfer of the subject air mover business and associated contract rights (including the right to use the "Mytee" name) from H. D. Products, or Walker and Pardus, to Viking.

Without rehashing the evidence in detail at this point, some of these apparent discrepancies and inconsistencies were explained at trial.  The court is satisfied, based upon the evidence presented, that they were due primarily to inadvertence, a lack of sophistication in documenting business transactions, and the relative speed at which these transactions and events ensued. The subsequent conduct of the parties, however,

supports a finding that everything acquired by Defendants, or any of them, from Mytee and/or LaBarbera, including the authorization to use the "Mytee" name, was informally transferred and assigned to Viking, which then carried on the air mover business in its corporate name.  Under the facts and circumstances of this case, particularly including the nature and size of the business entities involved, the close relationships between the principals of those entities, and the absence of any apparent deception or subterfuge, the court deems it unnecessary to make technical legal distinctions between the individuals and the entities through which they did business.

In light of the foregoing, the evidence supports findings that LaBarbera had the authority to permit Walker and Pardus to use the "Mytee" name, that all parties understood and expected from the beginning that the new air mover business would be carried on by an entity (i.e., Viking) to be formed by Walker and Pardus specifically for that purpose, that Walker and Pardus were free to assign or otherwise transfer all assets acquired from Mytee (including the right to use the "Mytee" name) to that entity, and that no one was deceived or disadvantaged by any of these alleged "uncertainties."

**F.      Damages and/or Other Monetary Relief**.

The Lanham Act identifies three general categories of potential damages for trademark infringement—the defendant's profits, any damages sustained by the plaintiff (including its lost profits), and the costs of the action, all "subject to the principles of equity."  15 U.S.C. § 1117 (a).  Simplistic as that may sound, the case law on monetary recovery in trademark infringement cases is "a confusing mélange of common law and equity principles, sometimes guided (and misguided) by analogies to patent and copyright law, and finding little statutory guidance in the Lanham Act."   McCarthy,

McCarthy on Trademarks and Unfair Competition (Fourth Ed.), Vol. 5, "Remedies," § 30:58. Within that "confusing mélange," it appears that trial courts are afforded significant flexibility in fashioning appropriate remedies based upon the unique facts of each case and based upon general equitable principles.

For instance, there is some support in the case law for awarding a "reasonable royalty" (a remedy which is more typically found in patent infringement and copyright cases) if the other more usual measures of damages do not fit in a particular case, or if a reasonable royalty would otherwise be a more accurate reflection of the defendant's unjust enrichment.  See, e.g., *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 963 (7th Cir. 1992), upholding a reasonable royalty award over a disgorgement of profits award which was deemed to be a "windfall to the plaintiff."  There is also support in the case law for the proposition that a disgorgement of defendant's profits is not appropriate unless the plaintiff proves that the defendant acted willfully or in bad faith.  *See, e.g., Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993) (to award profits where defendant's infringement was unintentional could constitute an impermissible penalty). In fact, according to McCarthy, supra at § 30:62, that appears to be the "Modern Rule," which he describes as follows: "To obtain an accounting of profits, the courts almost always require that defendant's infringement imply some connotation of 'intent,' or a knowing act denoting an intent, to infringe or reap the harvest of another's mark and advertising."  Although there is now a split of authority among the circuits on that subject, it appears that the Ninth Circuit remains committed to the so-called "Modern Rule."  *See, e.g., Lindy Pen Co., supra.*

The parties are in substantial disagreement here as to the appropriate measure of

damages applicable to Plaintiffs' trade mark infringement claim.  Plaintiffs assert that the disgorgement of Defendants' profits is the appropriate measure, whereas Defendants assert that a reasonable royalty is the appropriate measure.   On balance, as discussed below, it appears to the court that a reasonable royalty is the appropriate measure of damages under the facts and circumstances of this case.

Plaintiffs presented expert testimony on trademark infringement damages from Patrick F. Kennedy, Ph.D.   Dr. Kennedy considered only the disgorgement of profits measure of damages (apparently because that's what was specified by counsel for Plaintiffs).  Using an "incremental" cost analysis (with an assumption that 85% of all of Viking's sales were "incremental"), rather than a "fully-allocated" (or "absorption") cost analysis, he concluded that Defendants' grossed $5,366,566 and netted $775,525 in profits on sales of all air movers from May 2004 through July 2006. (He didn't have adequate documentation to determine net profits on sales after July 2006.) He then broke down the total air mover sales into sales of "Non-Private Label Air Movers" and sales of "Private Label Air Movers," concluding that sales of the former grossed $2,773,455 and netted $520,836, whereas sales of the latter grossed $2,072,274 and netted $256,689. [These calculations are set forth in his "Damage Summary," portions of which were introduced at trial as Exhibit 129.]  When asked on cross-examination to make the same calculations for the period May 2004 through August 2005 (the date when Defendants claim all alleged infringing activity ceased), he concluded that sales of "Non-Private Label Air Movers" during that period netted approximately $58,000, and sales of "Private Label Air Movers during that period netted approximately $63,122.

In response, Defendants presented expert testimony on trademark infringement

damages from Blake B. Inglish, C.P.A.  He analyzed various approaches to determining potential damages, including loss of profits incurred by the trademark owner (Mytee here), and disgorgement of profits (based upon unjust enrichment) received by the alleged trademark infringer (Defendants here).  He concluded that a loss of profits analysis was not appropriate here because Mytee's sales and profits actually increased during the subject time period.  Likewise, he concluded that a disgorgement/unjust enrichment analysis was not appropriate here because, among other things, he saw no convincing or quantifiable relationship between the alleged infringing activity (i.e., use of the "Mytee" name) and the profits achieved by Defendants from the sale of air movers. Stated in another fashion, he saw convincing evidence that the profits generated by Defendants were due largely to their own efforts and circumstances other than the use of the "Mytee" name (including, for example, changes to the product, new marketing strategies, extension of the warranty period, expansion out of the janitorial supply market and into the restoration market, experience in the industry, and long-term distributor relationships, etc.).  Also, Mr. Inglish did a "price premium" analysis, which confirmed that the "Mytee" trademark did not produce a "price premium." He determined that "Mytee" labeled air movers and Viking's private label air movers sold before September 2005 sold at about the same price, and that "Mytee" labeled air movers and Viking labeled air movers sold after September 2005 also sold at about the same price (i.e., the "Mytee" label appeared to have no intrinsic value).

Mr. Inglish was also critical of the methodology used by Dr. Kennedy in that, among other things, it seemed to assume that all of Viking's profits from all of its products were generated by, or attributable to, Defendants' infringing activity.  Also, it relied upon

an "incremental cost" analysis, which in Mr. Inglish's opinion, does not make economic sense and is not otherwise appropriate when, as here, the accused product comprises the great majority (i.e., 85%) of total sales.  He explained that, generally speaking, an "incremental cost" approach attempts to measure only the cost of the next unit produced, and thus doesn't include many of the more substantial "fixed" costs (i.e., rent), whereas the "full allocation" or "absorption" cost method measures and allocates all costs.

For those and other reasons, Mr. Inglish testified that a reasonable royalty measure of damages makes more economic sense under these facts and circumstances.  Briefly stated, it provides a reasonable method for quantifying and apportioning the economic benefits received from trademark infringement, and it is recognized and accepted within the intellectual property field (albeit more often in patent and copyright cases than in trademark infringement cases).  As Mr. Inglish explained it, it assumes that the two parties sat down at the bargaining table (at or just before the date of the first alleged unauthorized use) and negotiated a license agreement authorizing the use of the "Mytee" name.  Without rehashing Mr. Inglish's testimony in detail here, suffice it to say he explained his methodology in determining that a royalty in the amount of 2% of gross revenues from the sales of the accused products would be consistent with the economic circumstances here and with recognized practices within the intellectual property field.

Assuming, as discussed above, that Defendants were authorized to use the "Mytee" name through April 30, 2005 (one year from the date of purchase of the air mover business from Mytee), Mr. Inglish applied his 2% royalty calculation only to sales of "accused products" from May 1, 2005 through August 2005, when the evidence indicates

that the infringing sales ceased.  For the purposes of his opinions here, Mr. Inglish assumed that the "Non-Private Label Air Movers" are the "accused products," since they were the air movers being sold under the "Mytee" name (whereas the "Private Label Air Movers" were manufactured for other customers who would in turn sell them under their own label or logo).  His figures, as extrapolated from Mytee's financial reports, show gross revenues on those sales in the amount of $467,121 for the period from May 1, 2005 through August 31, 2005.  A 2% royalty on that amount would thus be $9342.42.

As noted above, the court finds Mr. Inglish's reasonable royalty measure of damages to be the more appropriate one under the unique facts and circumstances of this case.  Uppermost among those unique facts and circumstances is the fact (as now determined by the court) that Defendants did have permission to use the "Mytee" name from May 1, 2004 through April 30, 2005.  Given that fact, Plaintiffs can not establish the requisite wrongful or willful intent required (under the so-called "Modern Rule") to justify a disgorgement of profits remedy here.  In addition, it appears to the court that disgorgement of profits under these facts would result in a "windfall" to Plaintiffs.  As noted above, Plaintiffs' expert calculates that Defendants' net profits from all air mover sales between May 1, 2004 and July 31, 2006, totaled $775,525 (and Plaintiffs now apparently seek additional amounts for Defendants' "assumed" net profits from July 2006 to the present date).  Even though a "reasonable royalty" is not a typical measure of damages in a trademark infringement case, it is an appropriate measure when disgorgement of profits would result in a "windfall" to the plaintiff. *See, e.g.*, *Sands, Taylor & Wood Company v. Quaker Oats Company* ("Sands I"), 978 F.2d 947, 963 (7th Cir. 1992).

As noted above, while Plaintiffs have no proof that Defendants manufactured any

air movers bearing the "Mytee" label after June 2005, they still seek profits for Defendants' sales of air movers after that date because some of Defendants' independent distributors continued to use the "Mytee" name in advertising and selling Viking's previously manufactured air movers. (See, e.g., Exhibits 75, 80, 85, and 95). Briefly stated, Plaintiffs contend that Defendants are liable for any infringing activity of those distributors, and they apparently base that contention upon the doctrine of "contributory infringement." It appears to the court that application of that doctrine requires a more direct participation in the alleged infringing activity than occurred here. For instance, in *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378 (9th Cir. 1984), one of the cases cited by Plaintiffs on this issue, the trial court found that the defendants "foresaw and intended" that the accused products would be passed off as the plaintiff's products. There is no evidence here that Defendants actively participated in or otherwise encouraged any continuing infringement by those independent distributors. To the contrary, there was evidence that they attempted to prevent it. On that point, Rick Moon (a Viking employee) testified that he contacted the subject distributors in an attempt to get them to stop using the "Mytee" name (see, e.g., Exhibits OJ, OK, and OL), although his efforts were unsuccessful.

The court is satisfied, from the evidence presented, that any such conduct by independent distributors was ultimately beyond Defendant's control. Further, whatever revenue may have been generated from any such arguably infringing activity was not received by Defendants, and thus would not be subject to disgorgement herein. Moreover, LaBarbera conceded in his testimony that no one from Mytee ever made any efforts to stop those independent distributors from advertising and selling old air movers

bearing the "Mytee" label.  Under these circumstances, Defendants should not be held liable for the conduct of their independent distributors.

Plaintiffs also seek monetary damages in the amount of $17,385 for the "corrective advertising" they claim was necessary to clear up the alleged confusion in the marketplace caused by selling Defendants' air movers under the "Mytee" name.  This "corrective advertising" consisted of the full-page "Curtains for Counterfeiters" spread which appeared in leading industry publications in or about September 2007 (Exhibits 98, 99, and 100).  LaBarbera confirmed in his testimony that Defendants were the purported "Counterfeiters" referenced in the ad.  Since, as discussed above, the court has now determined that Defendants were authorized to use the "Mytee" name, at least up to April 30, 2005, "corrective advertising" was neither necessary nor appropriate.  Nor was it appropriate, in the court's view, to label the Defendants as "Counterfeiters." Accordingly, the court finds that Plaintiffs are not entitled herein to an award of monetary damages for any such "corrective advertising."

Plaintiffs also seek monetary damages in the amount of $64, 725 for the estimated cost of product liability insurance for any claims that may be pursued against them in the future as a result of injuries or damages caused by air movers manufactured by Defendants bearing the "Mytee" label.   Plaintiffs presented testimony from a risk management expert/consultant (Robert E. Ford) to the effect that Mytee is not covered now, either under its own policy or as an additional insured under Defendants' policies, for that potential risk.  He did not have an actual quote from any carrier, and had not actually "shopped" the coverage anywhere, but he opined that if such coverage could be obtained, it would likely cost $64,725.  He conceded that his minimum cost estimate

would go down approximately $5000 due to the passage of time and the absence of any claims since the date of his initial report (although the fact that Viking had produced more "Mytee" units than he originally had assumed might cause the cost to rise somewhat), such that his minimum cost estimate at the time of trial was $59,725.   If coverage could not be obtained at all, the alternative, in his opinion, would be a self-insured retention in the amount of $10.00 per unit (he assumed there might be a total of 25,000 units in still use), or $250,000.

Mr. Ford is obviously a well-qualified expert, and the court takes no issue with his overall analysis.  However, it appears to the court that Plaintiffs have not sustained their burden of proof on this element of their claimed damages.  With the exception of one claim involving a minor injury to a child's hand (due to the absence of a protective grill, which was subsequently corrected) which settled for $1200, it appears there have been no claims involving the estimated 200,000 air movers manufactured by Plaintiffs or Defendants over the last ten (10) years.  Further, Plaintiffs have known of this potential "risk" since April 30, 2004, when they sold the air mover business to Defendants, yet they apparently never before sought this type of coverage.  Moreover, Plaintiffs own expert was not certain that this coverage would be available in today's market.  Under the circumstances, it is speculative, at best, to conjecture whether Plaintiffs will ever seek this coverage, and even if they do, whether they could now obtain it.  Accordingly, the Court finds that Plaintiffs are not entitled to an award of monetary damages for the estimated cost of product liability insurance.

Lastly, Plaintiffs also seek an award of treble damages pursuant to 15 U.S.C. § 1117(b) as a result of what they deem to be the "intentional" misconduct of Defendants.

Since, as noted above, the court has now determined that Defendants had permission to use the "Mytee" name (at least up to April 30, 2005), the evidence does not establish a basis for awarding treble damages (or any other amount of penalty damages) herein.

**G.      Injunctive Relief**.

For many of the same reasons discussed above, Plaintiffs have not sustained their burden of proof on their claim for injunctive relief.  Defendants are not presently engaging in any infringing activity, and there is no evidence that they intend to engage in any infringing activity in the future, such that there is nothing to enjoin.  Moreover, Mytee's previous covenant not to compete has expired, and Mytee is back in the market making its own air movers (under its own name) and competing with Viking.  Likewise, the evidence supports a finding that Defendants' independent distributors and manufacturer's representatives are not presently advertising and selling air movers manufactured by Plaintiffs under the "Mytee" name.  Moreover, even if they were, Plaintiffs would have no clear ability under the law to prevent them from doing so, and it is thus inappropriate here to attempt to require Plaintiffs, by mandatory injunction or otherwise, to do something that they are powerless under the law to do.

II

**Unfair Business Practices**

As noted above, Plaintiffs Unfair Business Practices Claim (Second Claim for Relief) is "substantially congruent" to a trademark infringement claim under the Lanham Act. See, e.g., *Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir. 1991) (citations omitted).  Accordingly, this claim will not be discussed separately herein.

### III

### Injunction

As also noted above, the relief sought by Plaintiffs under their Injunction claim (Third Claim for Relief) is essentially the same as the injunctive relief sought by Plaintiffs under their Trademark Infringement and Unfair Business Practices claims.  Accordingly, this claim will not be discussed separately herein.

### IV

### Misappropriation of Trade Secrets

As noted above, Plaintiffs' Misappropriation of Trade Secrets claim (Fourth Claim for Relief) is based primarily upon the alleged conduct of Perez/Shoemaker.  The evidence presented at trial supports a finding that Perez/Shoemaker was not acting as the "partner" or "agent" of Defendants, or any of them, in acquiring and/or communicating what Plaintiffs claim to be their "trade secrets" or confidential information.  As Perez/Shoemaker (through his deposition) and Walker and Pardus all testified, none of them ever considered Perez/Shoemaker to be Walker's and/or Pardus' "partner," or an owner or principal of Viking.  The fact that he wrote a check for $4000 as a down payment for an intended future purchase of an interest in Viking does not change that result.  The evidence establishes that his $4000 was ultimately returned to him, and that his proposed acquisition of an ownership interest in Viking simply never occurred.  Perez/Shoemaker himself may have incurred some potential liability to Plaintiffs as a result of his actions, but neither his actions nor his knowledge can be attributed to Defendants, or any of them, here.

Moreover, Plaintiffs have not sustained their burden of proof that anything

qualifying as a protected "trade secret" was actually communicated to Defendants, or any of them.  For example, the evidence shows that Mytee's "customer list" was e-mailed from Perez/Shoemaker to himself, and not to Defendants, or any of them (Exhibit 41).  And even if he had sent it on to Defendants, or any of them, the evidence does not establish that this was a "protected" trade secret, or that the list contained any information that Defendants did not know already (i.e., they had been long-time manufacturers' representatives for Plaintiffs, and, in addition, they had received Plaintiffs' air mover customer list with their purchase of the air mover business).

As for the "ISSA trade show leads," while the evidence shows that they were e-mailed by Perez/Shoemaker to Viking (Exhibit 31), the evidence also shows that Defendants were physically present at Mytee's booth (at Mytee's invitation) during the trade show when the "leads" were received and recorded, and that some of those "leads" were specifically intended for Defendants (i.e., they weren't Mytee's "trade secrets").

As for the "Dri-Eaz" distributor list, while the evidence shows that it also was e-mailed by Perez/Shoemaker to Viking (Exhibit 38), this was another company's distributor list (not Plaintiffs' list), and the evidence showed that it was compiled from public information available to all on the internet (i.e., it also was not a "trade secret" of Mytee).

As for the "Tradewinds axial fan parts list," while this also was e-mailed by Perez/Shoemaker to Viking (Exhibit 39), the evidence showed that it was an old list for a discontinued product, that its contents were already known by or available to Defendants, and that it had never before been protected as a "trade secret."

And lastly, as for Mytee's "pricing information," this also was e-mailed by

Perez/Shoemaker to himself, and not to Defendants (Exhibit 43), and there is no evidence that it was ever communicated to Defendants.   Perez/Shoemaker himself could not remember much about this e-mail (according to his deposition testimony read into evidence at trial), except that it related to one of Mytee's distributors in Canada (Larry Vaughn), and that it was probably something he felt he needed to work on at home.

In addition, Plaintiffs did not establish at trial that they took the usual steps necessary to "protect" their purported "trade secret" information.   Cal. Civ. Code § 3426.1(d) defines a "trade secret" as, among other things, something that "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." While Plaintiffs here may have had computer access codes, locking file cabinets, and security cameras, there was no comprehensive written "confidentiality" policy, the subject documents were not marked "confidential," and there was no clear policy prohibiting employees from bringing company information home (or e-mailing it to themselves) on occasion if necessary to keep up with their work.

For the foregoing reasons, the court determines that Plaintiffs have not and cannot sustain their burden of proof on their misappropriation of trade secrets claim.   Their damages claims under this cause of action (including their claim for $17,385 for loss of a purported four-month "head start" in producing their new axial fan product, and their claim for punitive damages) thus become moot, and need not be addressed further herein.   The court notes, however, that the evidence shows that Viking did not manufacture its own axial fan, but instead had one built for it by another company (Thermastor), and there is no evidence that either Viking or Thermastor ever used Mytee's old axial fan parts list to get a "head start" on Plaintiffs, or for any other reason.

### Conclusion

For the foregoing reasons, judgment shall be entered herein in the amount of **$9342.42**, plus interest at the legal rate from Sept. 1, 2005 to the date of judgment, in favor of Plaintiff Mytee Products, Inc., and against Defendants, and each of them, jointly and severally.

**IT IS SO ORDERED.**

Dated: May 13, 2009

MICHAEL M. ANELLO
United States District Court Judge